J-S08012-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

IN RE: J.M., A MINOR

APPEAL OF: J.M., FATHER

:  IN THE SUPERIOR COURT OF
:        PENNSYLVANIA
:
:
:
:
:
:
:
:
:  No. 1293 MDA 2021

Appeal from the Decree Entered August 10, 2021
In the Court of Common Pleas of Northumberland County Orphans' Court
at No(s):  Adoptee # 48-2020

BEFORE:  BOWES, J., NICHOLS, J., and McCAFFERY, J.

MEMORANDUM BY BOWES, J.:                    **FILED APRIL 27, 2022**

J.M. ("Father") appeals from the decree entered on August 10, 2021, which terminated his parental rights to his daughter, J.C.M., born in June 2016.[1]  We affirm.

Northumberland County Children and Youth Services ("CYS") was already involved with Father in an unrelated matter with another child when Mother, J.C.M., and J.M.R. moved in with Father.  CYS expanded its involvement at that time to include them.  In January 2019, CYS visited their

_____

[1] The orphans' court entered a separate decree terminating the rights of J.C.M.'s mother, J.R. ("Mother").  Mother has filed appeals at 1292 MDA 2021 and 1294 MDA 2021, regarding the termination of her parental rights as to J.C.M. and her half-sister, J.M.R., born in January 2014, respectively.  As a note, we have added middle initials for clarity within this memorandum for J.C.M. and J.M.R. because the children's first and last initials, as used in the captions, are identical to those of either Mother or Father.  Additionally, while Father assumed a parental role for J.M.R., he is not her biological father.  The orphans' court entered a separate decree terminating the rights of J.M.R.'s father, who is unknown and has not filed an appeal.

home and attempted to administer drug tests to Father and Mother. Father refused; Mother tested positive for a controlled substance. Ultimately, CYS took J.C.M. and J.M.R. into custody and placed them in kinship care.

J.C.M. and J.M.R. were adjudicated dependent based upon concerns with substance abuse, inadequate housing, lack of parenting abilities, and lack of employment. As it pertains to Father, he was ordered to undergo a drug and alcohol evaluation, comply with treatment recommendations, obtain stable housing and employment, visit with J.C.M., and complete parenting classes.[2] Orphans' Court Opinion in Support of Final Decrees, 8/10/21, at unnumbered 1. Due to a lack of engagement with services and contact with J.C.M., aggravated circumstances were found to exist against Father in August 2019.[3]

In February 2020, J.C.M. and J.M.R. changed kinship care and were placed with P.L. ("Maternal Grandmother"),[4] who lives in the state of Georgia. In June 2020, Father and Mother moved into a residence owned by Mother's father ("Maternal Grandfather") in Georgia. At that time, Father and Mother

---

[2] Since the certified record does not include the child permanency plan for J.C.M., we glean the concerns at adjudication and the goals for reunification from the testimony presented at the termination hearings and opinion of the orphans' court in support of the final decrees.

[3] The same concerns and orders applied to Mother with respect to J.C.M. and J.M.R., and the court likewise found aggravating circumstances against Mother for the same reasons.

[4] The children have remained in Maternal Grandmother's home since that time. Maternal Grandmother is a pre-adoptive resource for J.C.M. and J.M.R.

began calling the children daily, though the calls were mainly between Father and J.C.M.

In September 2020, CYS filed a petition to terminate the parental rights of Father as to J.C.M. pursuant to 23 Pa.C.S. § 2311(a)(1), (2), and (5), based on his failure to complete the child permanency plan.[5] Shortly before the petition was filed, Father completed a drug and alcohol evaluation through Georgia Hope and began the recommended treatment.[6]

A permanency review hearing was held in November 2020. Father secured employment prior to the hearing, but subsequently quit that same week. Following the hearing, the court found compelling circumstances existed not to terminate because Father lived close enough to J.C.M. to establish a relationship and perform parental duties, CYS withdrew the petition to terminate Father's parental rights, and Father began attending weekly in-person visits with J.C.M. Maternal Grandmother supervised the visits, which were also attended by Mother and J.M.R.

Meanwhile, as part of the treatment program at Georgia Hope, Father was required to call in daily to determine whether it was his turn for a random drug test based upon a color-wheel system. However, he failed to make the

_____

[5] CYS also filed petitions to terminate against Mother as to J.C.M. and J.M.R., as well as against J.M.R.'s unknown father.

[6] Mother began treatment at Georgia Hope at the same time. There is some discrepancy as to the number of treatment sessions Father attended. Father claimed he attended seven sessions, *see* N.T., 5/5/21, at 89-91, whereas Cheryl Weigand, a certified alcohol and drug counselor at Georgia Hope, testified that Father attended four sessions, *see* N.T., 4/8/21, at 5.

daily calls and was not administered a single drug test between September 2020 and January 2021. According to Father, he stopped attending the sessions in the middle of December 2020 because he was overwhelmed with preparations for the Christmas holiday and depressed. As a result of his non-attendance, Father was discharged from Georgia Hope in January 2021.

In January 2021, CYS sought and was granted the right to reinstate the petitions to terminate the parental rights of Mother and Father. The orphans' court held hearings on the petitions to terminate on April 8, 2021, and May 5, 2021.[7] CYS presented the testimony of several individuals from CYS, as well as a counselor from Georgia Hope and Maternal Grandmother. Maternal Grandmother testified that Father and Mother visited the children weekly and called on the phone daily. While the visits had gone well and the children were happy to see their parents, she did not believe Father and Mother were ready to parent J.C.M. and J.M.R. as they did not have jobs or a car and had not been drug tested. She testified that if the parents' rights were terminated, she would permit them to remain part of the children's lives via visits, calls, and holiday celebrations.

Father testified on his own behalf, as did Mother. At the time of the hearing, Father was living in a hotel and seeking new housing because

---

[7] The court appointed Cindy Kerstetter, Esquire, as the guardian *ad litem* during the dependency proceedings. Attorney Kerstetter was appointed as legal counsel during the termination proceedings "after certifying on the record that there was no conflict between what was best for the girls and the girls' desired outcome." Orphans' Court Opinion in Support of Final Decrees, 8/10/21, at unnumbered 2 n.2.

Maternal Grandfather had asked him to vacate the residence when Mother became incarcerated.[8]  Regarding Father's substance abuse issues, the counselor from Georgia Hope testified that Father's case was reopened on March 8, 2021.  According to Father, he underwent a new evaluation and had one treatment session since his case reopened, but still had not been drug tested.  Finally, Attorney Kerstetter stated that the children loved their parents and, if allowed, would live with them.

Following the hearings, the orphans' court issued a decree terminating Father's parental rights as to J.C.M. pursuant to § 2511(a)(2), (5), (8), and (b).  Father filed a timely notice of appeal and concise statement pursuant to Pa.R.A.P. 1925(a)(2).  The orphans' court did not file a Rule 1925(a) opinion or statement in lieu of opinion with this Court.  Father presents the following issues for our consideration:

> I. Whether the trial court erred and/or abused its discretion in its determination that Northumberland County Children and Youth Services presented clear and convincing evidence to terminate Father's rights under 23 Pa.C.S.A. § 2511(a)(2), 2511(a)(5), and 2511(a)(8)[.]
>
> II. Whether the trial court erred and/or abused its discretion in finding the termination of his parental rights would best serve the development, physical, and emotional needs and welfare of the children.

---

[8] Mother was incarcerated on pending criminal charges.  At the termination hearing, the court tried to avoid any testimony about the underlying conduct for the charges.  Nonetheless, it appears the charges related to when Mother, without permission, removed the children from their initial kinship foster home based upon alleged abuse.  *See* N.T., 5/5/21, at 10, 19, 57, 65, 74.

Father's brief at 10 (cleaned up).

In matters involving involuntary termination of parental rights, our standard of review is as follows:

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized [the appellate court's] deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (cleaned up). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G. & J.G.*, 855 A.2d 68, 73-74 (Pa.Super. 2004) (citation omitted). "[I]f competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." *In re Adoption of T.B.B.*, 835 A.2d 387, 394 (Pa.Super. 2003) (citation omitted).

Termination of parental rights is governed by § 2511 of the Adoption Act and requires a bifurcated analysis of the grounds for termination followed by the needs and welfare of the child:

> Our case law has made clear that under [§] 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence

that the parent's conduct satisfies the statutory grounds for termination delineated in [§] 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to [§] 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted). We have defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*) (cleaned up).

Termination is proper when the moving party proves grounds for termination under any subsection of § 2511(a), as well as § 2511(b). *T.B.B.*, *supra* at 395. Father asserts that CYS failed to establish by clear and convincing evidence the statutory grounds for termination of his parental rights pursuant to 23 Pa.C.S. § 2511(a)(2), (5), (8), and (b). To affirm the termination of parental rights, we need only agree with the orphans' court as to any one subsection of § 2511(a), as well as § 2511(b). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*). We focus our analysis on § 2511(a)(2) and (b), which provide as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . . .

- 7 -

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

. . . .

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(2), (b).

First, we address whether the orphans' court abused its discretion by terminating Father's parental rights pursuant to § 2511(a)(2).  Termination under this subsection requires that the moving party prove the following elements:  "(1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *In re C.M.K.*, 203 A.3d 258, 262 (Pa.Super. 2019) (citation omitted). Termination is not limited to affirmative misconduct but may be based upon parental capacity that cannot be remedied.  *Id*. (citation omitted).  Finally,

"[p]arents are required to make diligent efforts toward the reasonably prompt assumption of full parental duties." *Id*. (citation omitted).

Father argues that he "had done everything he could do" by securing stable housing and participating in treatment at Georgia Hope. Father's brief at 15.[9] According to Father, he had previously completed and was successfully discharged from a drug and alcohol treatment program as a condition of a sentence he received in New York. *Id*. at 16. He maintains that he is not addicted to a controlled substance and is willing to be drug tested. *Id*.

The orphans' court, on the other hand, concluded that Father has "failed to remedy the circumstances which led to placement." Orphans' Court Opinion in Support of Final Decrees, 8/10/21, at unnumbered 4. Specifically, Father has "avoided services meant to better [his] parenting and functioning[,]" his "substance abuse concerns remain[,]" he has not "maintained employment[,]" and he has "not taken advantage of the services offered by" CYS. *Id*.

The assessment of the orphans' court is supported by the certified record. At the time of the termination hearings, J.C.M. had been in care for over two years based upon substance abuse concerns and a lack of adequate housing, parenting abilities, and employment. Father was aware of the child permanency plan and, more specifically, his need to address his substance

---

[9] We note with displeasure that Father's counsel has apparently re-used portions of other briefs herein. *See* Father's brief at 1 (basing this Court's jurisdiction on the imposition of a judgment of sentence); *id*. at 11 (using female pronouns for Father); *id*. at 13, 17 (describing termination as to "the children" instead of the lone subject child, J.C.M.).

abuse issues. N.T., 4/8/21, at 26-28, 31, 33 (ordered to complete drug testing, drug and alcohol counseling, and parenting); N.T., 5/5/21, at 61. However, during that period, Father failed to remedy the underlying concerns.

With respect to the primary concern, Father's substance abuse, Father claimed that he had previously completed six weeks of intensive outpatient drug and alcohol treatment at a Merakey facility in January or February of 2019, as part of a plea agreement in New York to drug possession charges, and he notified CYS of same. N.T., 4/8/21, at 28; N.T., 5/5/21, at 38-40, 48-49. CYS submitted a request for those records and Father signed a release, but CYS never received any records from Merakey. N.T., 4/8/21, at 28, 35; N.T., 5/5/21, at 40. CYS casework supervisor Diana Stine testified it is historically difficult to get records from Merakey. N.T., 4/8/21, at 35. However, regardless of whether Father completed any treatment at Merakey, Ms. Stine testified that "he was advised that he was still expected to do drug and alcohol treatment" because he continued to test positive for controlled substances following J.C.M.'s dependency adjudication. *Id*. at 28, 36, 38; *see also* Exhibit A4 (positive lab test results for 2/7/19 urinalysis); Exhibit A5 (positive cup results for 6/13/19 urinalysis); Exhibit A6 (positive lab test results for 8/16/19 urinalysis).

Despite being advised that he still needed to complete drug and alcohol treatment as part of the child permanency plan, Father did not pursue treatment until he completed an evaluation at Georgia Hope in September 2020, approximately nineteen months after J.C.M. was placed in kinship care.

N.T., 4/8/21, at 5, 50-51. While Father initially attended the recommended treatment sessions at Georgia Hope, he missed three or four sessions beginning in December 2020 because he was preoccupied with the Christmas holiday and depressed, and failed to comply with the color-wheel system because he forgot to call in daily. *Id*. at 10, 70; N.T., 5/5/21, at 48, 54, 91-92. As a result, he was discharged for non-attendance. N.T., 4/8/21, at 5, 7.

Coincidentally, it was not until after CYS requested reinstatement of the petition to terminate Father's parental rights that he sought to reopen his treatment program with Georgia Hope. *Id*. at 69 (after being advised that CYS intended to seek reinstatement of the termination petition, Father and Mother told their current CYS caseworker, Kim Carpenter, that they "want[ed] to start services again to comply with the [c]ourt-ordered services and the child permanency plans"). As of the second termination hearing, Father had undergone a new evaluation and attended one session, but still had not been drug tested. *Id*. at 5-8; N.T., 5/5/21, at 56, 88-91.

Rebecca Horst, one of the assigned CYS resource workers, testified that Father failed to complete the parenting, budgeting, and community resource services offered by CYS. N.T., 4/8/21, at 56, 62. Father was discharged from court-ordered parenting classes in June 2019 for non-attendance. N.T., 4/8/21, at 71; N.T., 5/5/21, at 62 (Father testifying that he only attended one week of classes and decided after move to Georgia that he would not do parenting classes).

Father's sole employment was for approximately one week around the November 2020 permanency review hearing, which he quit in anticipation of the weekly visits with J.C.M. N.T., 4/8/21, at 70, 77; N.T., 5/5/21, at 24. In January 2021, Father turned down a job because of a concern with the hours and being able to simultaneously comply with visitation, his treatment at Georgia Hope, and the color-wheel drug testing system. N.T., 4/8/21, at 70, 75. During Father's testimony, he indicated that he has not worked since moving to Georgia, save for approximately one week in November 2020, because nothing was within walking distance, he needed time for visits with J.C.M., and he was receiving unemployment. N.T., 5/5/21, at 46-47.

As to the stable housing concern, Father and Mother had been living in a residence provided by Maternal Grandfather in Georgia beginning in 2020. N.T., 4/8/21, at 76; N.T., 5/5/21, at 24. However, at the time of the second termination hearing, Father was living in a hotel while looking for an apartment because Maternal Grandfather asked him to vacate the residence after Mother became incarcerated. N.T., 5/5/21, at 24, 45.

Stated simply, Father has failed to substantially comply with his court-ordered goals or remedy the causes leading to his incapacity. While it is evident at the time of the hearings that Father was attempting to comply with portions of the child permanency plan by re-enrolling in drug and alcohol treatment and seeking stable housing,

> the statute implicitly recognizes that a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot

and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future.

**In re Adoption of R.J.S.**, 901 A.2d 502, 513 (Pa.Super. 2006).  Accordingly, the orphans' court did not abuse its discretion in finding statutory support for termination pursuant to § 2511(a)(2).

We now turn to § 2511(b).  This Court has explained the requisite analysis as follows:

> Subsection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child.  In **In re C.M.S.**, 884 A.2d 1284, 1287 (Pa.Super. 2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child."  In addition, we instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond.  **Id**.  However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists.  **In re K.Z.S.**, 946 A.2d 753, 762-63 (Pa.Super. 2008).  Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case.  **Id**. at 63.

**In re Adoption of J.M.**, 991 A.2d 321, 324 (Pa.Super. 2010).

Father assails the orphans' court for failing to order a bonding assessment and maintains that he has had "consistent and appropriate visitation with his child."  Father's brief at 18.  Father further argues that he explained to CYS that he would be unable to maintain employment and comply with Georgia Hope's color-wheel system simultaneously.[10]  **Id**.

---

[10] We note that this argument pertains to § 2511(a), not § 2511(b).

As a general matter, Pennsylvania does not require the orphans' court to enlist a formal bonding evaluation or base its needs and welfare analysis upon expert testimony. *In re Z.P.*, 994 A.2d 1108, 1121 (Pa.Super. 2011). "Common sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *In re T.S.M.*, *supra*, at 268. In weighing the bond considerations pursuant to § 2511(b), "courts must keep the ticking clock of childhood ever in mind." *Id*. at 269. "Children are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." *Id*. A court cannot "toll the well-being and permanency" of a child indefinitely in the hope that a parent "will summon the ability to handle the responsibilities of parenting." *In re C.L.G.*, 956 A.2d 999, 1007 (Pa.Super. 2008) (*en banc*) (citation omitted).

> In relation to § 2511(b), the orphans' court provided as follows:

> [The orphans' c]ourt finds credible the testimony of the caseworkers, resource worker, and Maternal Grandmother that the children see maternal grandparents as their primary caretakers. The parents are not "parental" figures for the children. The children are both young and need permanence. Th[e orphans' c]ourt is also mindful of the fact that because the [m]aternal [g]randparents are the adoptive resource, it is unlikely that the parents will ever be shut out of their children's lives. It was testified to extensively that the parents visit "whenever they want" and they do have a bond with their children. Because legally terminating their parental rights will not change the actual relationship the parents have with their children, the effect of severing that bond in a termination is minimal.

Orphans' Court Opinion in Support of Final Decrees, 8/10/21, at unnumbered 4-5.[11]

This assessment is supported by the certified record. At the termination hearing, it was evident that a bond exists between Father and J.C.M. and that she loves him. Father has had phone and video calls daily since June 2020 and has had weekly in-person contact with J.C.M. since November 2020. N.T., 5/5/21, at 5, 13, 22-24. However, we find the orphans' court's description of the visits as "akin to 'playdates' as opposed to parental interactions" accurate. Orphans' Court Opinion in Support of Final Decrees, 8/10/21, at unnumbered 4. For example, the visits only last approximately one and one half to two hours. N.T., 5/5/21, at 23. Maternal Grandmother generally chooses the locations for the visits and provides activities or crafts for the family. *Id*. at 5-7. Father and Mother usually provide food for the children during the weekly visits, but sometimes are not able to afford food and Maternal Grandmother will cover that expense when necessary. *Id*. at 5-6.

Significantly, it is Maternal Grandmother who provides the parental care for J.C.M., as well as the intangibles such as "love, comfort, security, and stability[.]" *J.M.*, *supra* at 324. Ms. Carpenter testified that since living with

---

[11] We are cognizant that the orphans' court considered J.C.M. and J.M.R. together in its opinion in support of the final decrees, likely because it issued the same opinion for Mother and Father. We focus our analysis herein on whether the record supports the orphans' court's conclusion solely as to J.C.M. and Father.

Maternal Grandmother, J.C.M. has been brought up to date on her vaccinations and received significant dental work due to a lack of prior dental care. N.T., 4/8/21, at 78. Maternal Grandmother further testified that J.C.M. has been in therapy, participated in extracurricular activities, is excelling in school, and has been thriving in every way possible since living with her. N.T., 5/5/21, at 4.

At the time of the hearings, J.C.M. expressed, through her counsel, that she loved Father and would live with him if possible. N.T., 5/5/21, at 96. While J.C.M. still expresses this abstract wish in her brief to this Court, she acknowledges the reality that Father has not addressed the issues that led to placement in the first place. Moreover, she has settled into a regular routine with Maternal Grandmother over the past two years and has flourished at school. As such, she now desires to remain living with Maternal Grandmother. *See* J.C.M. and J.M.R.'s brief at 2-4.

Critically, Maternal Grandmother testified at the termination hearing that little would change in terms of Father's contact with J.C.M. if his parental rights were terminated. Specifically, while acknowledging that daily phone calls might not continue, Maternal Grandmother envisioned that Father would still visit with J.C.M., call her, and partake in holiday celebrations. N.T., 5/5/21, at 15-16.

The certified record demonstrates that J.C.M. is best served by terminating Father's parental rights in anticipation of an adoption by Maternal

Grandmother. Stated plainly, J.C.M. has thrived since being in Maternal Grandmother's care, as she has provided a stable, loving environment that consistently satisfied J.C.M.'s developmental, physical, and emotional needs and welfare. Moreover, the record is clear that while a parental bond will legally be severed, Father will remain part of J.C.M.'s life even after termination. As such, the record supports the assessment of the orphans' court that the effect of legally severing the parental bond between Father and J.C.M. will not be detrimental to J.C.M.

Based on the foregoing, we affirm the decree of the orphans' court terminating Father's parental rights as to J.C.M.

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/27/2022